Heinz Binder (SBN 87908)
Wendy Watrous Smith (SBN 133887)
David B. Rao (SBN 103147))
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
T: (408) 295-1700
F: (408) 295-1531
Email: heinz@bindermalter.com
Email: wendy@bindermalter.com
Email: david@bindermalter.com

Attorneys for Appellant South River Capital, LLC

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No.   21-cv-03493-WHO |
| EVANDER F. KANE, | BK Case No.:  21-50028 SLJ |
| Debtor. | Chapter 7 |
| SOUTH RIVER CAPITAL, LLC | |
| Appellant, | |
| v. | |
| EVANDER F. KANE, | |
| Appellee. | |

# APPELLANT'S OPENING BRIEF

1
2
3

## <u>CORPORATE DISCLOSURE STATEMENT</u>

4
5
South River Capitol, LLC, appellant in this action, "Appellant" makes this statement pursuant to Bankruptcy Rule 8012.

6
7
Appellant has no parent corporation, and no publicly held corporation owns more than 10% of interests in Appellant.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.      JURISDICTION ................................................................................................. 1

II.     STATEMENT OF ISSUES ON APPEAL AND STANDARD OF REVIEW ........ 2

III.    STATEMENT OF THE CASE AND PROCEEDINGS BELOW ........................... 4

    A.   Kane's debts and his ability to pay them. ................................................... 4

    B.   Kane's Pre-Petition Activities ................................................................... 7

    C.   The Conversion Motion and related proceedings. ...................................... 8

IV.    SUMMARY OF ARGUMENT ......................................................................... 10

V.     ARGUMENT .................................................................................................. 14

    A.   The bankruptcy court abused its discretion when it considered Kane's
        interests beyond the scope and purpose of the Bankruptcy Code to deny the
        Conversion Motion. ................................................................................. 14

        1.   The legal standard that the Bankruptcy Court should apply when
            deciding a motion under Section 706(b) is limited to implementing
            the Bankruptcy Code, including rules of statutory interpretation. ............. 14

        2.   When a Bankruptcy Court considers a debtor's "fresh start" when
            deciding a motion to convert under Section 706(b), the court must
            limit its inquiry to the Bankruptcy Code itself. ........................................ 16

        3.   The Bankruptcy Court abused its discretion when it interpreted
            Kane's "fresh start" to include rights and interests beyond the scope
            of the Bankruptcy Code. .......................................................................... 19

    B.   The Bankruptcy Court imposed a heightened burden of proof on the Moving
        Parties by requiring they prove "with certainty" a specific amount of
        recovery under a proposed Chapter 11, and to "guarantee" that a consensual
        plan could be confirmed. ........................................................................... 23

        1.   The burden of proof in bankruptcy court proceedings is by a
            preponderance of the evidence, not a standard of "certainty" or clear
            and convincing evidence. .......................................................................... 23

        2.   The Bankruptcy Court improperly required that the creditors "prove
            with certainty" that conversion would increase recovery by a specific
            amount, and to "guarantee" the confirmation of a plan. ........................... 24

    C.   Under the correct legal standard and burden of proof, the Moving Parties
        met their burden under Section 706(b) and the case should be converted. ............. 26

        1.   The Bankruptcy Court concedes, and the evidence establishes that
            Kane's post-petition salary will add a substantial amount to the
            bankruptcy estate. .................................................................................... 26

i

2.   By holding that the Bankruptcy Court would not appoint a trustee if it converted the case to Chapter 11, it confirmed that the case would not be immediately re-converted to Chapter 7. ........................................... 27

3.   The Bankruptcy Court's finding that the Debtor cannot propose a confirmable Chapter 11 plan is not supported by the record and is largely contrary to the Bankruptcy Code. .................................................. 28

VI.          CONCLUSION ......................................................................... 33

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ...................................... 35

PRIMARY STATUTE TEXTS ...................................................................... 36

ii

# TABLE OF AUTHORITIES

## Cases

*In re Baker,*
    *503 B.R. 751, 750 (Bankr. MD Fla 2013)* ................................................................. 3, 28, 32

*In re Bammer (Murray v. Bammer)*,
    131 F.3d 788, 792 (9th Cir. 1997) ............................................................................. 3

*Children's Hosp. & Health Ctr. v. Belshe,*
    188 F.3d 1090, 1096 (9th Cir. 1999) ............................................................ 10, 15, 18

*Condon v. Brady (In re Condon),*
    358 B.R. 317. 320 (6th Cir. BAP 2007) ................................................................. 14

*Copland v. Fink (In re Copeland)*
    742 F 811, 814 (8th Cir. 2014) ................................................................................. 31

*Copper v. Copper (In re Copper)*,
    314 B.R. 628, 630 (6th Cir. B.A.P. 2004), *aff'd,* 426 F.3d 810(6th Cir. 2005) ..................... 2

*In re Decker,*
    535 B.R. 828, 838 (Bankr. D. Alaska 2015) *aff'd* 548 B.R. 813 (D. Alaska 2015) ...... 16, 18

*In re Federated Group,*
    107 F.3d 730, 732 (9th Cir. 1997) ............................................................................. 3

*Grogan v. Garner,*
    498 U.S. 279, 287 (1991) ............................................................................ 12, 16, 23, 24

*In re Hamilton*,
    803 F.Appx 123 (9th Cir. 2020) ............................................................................... 31

*Holsman v. Weinschneider,*
    322 F. 3rd 468, 475 (7th Cir 2003) ......................................................................... 16

*In re Nat'l R.V. Holdings, Inc.*, *supra,* 390 B.R. at 700 ....................................................... 33

*Johnson v. RFF Family P'ship LP (In re Johnson)*
    554 B.R. 448 (S.D. Ohio 2016) ............................................................................... 32

*In re Kawaauhau v. Geiger,*
    523 U.S 57, 62 (1998) ........................................................................................ 3, 17

*In re Nat'l R.V. Holdings, Inc.,*
    390 B.R. 690, 700 (Bankr. C.D. Cal. 2008) ............................................................. 17

*Norwest Bank Worthington v Ahlers*
    485 U.S.197, 206 (1988) ........................................................................... 15

*In Re Gordon, supra,* 465 B.R. 6 at 693 ............................................................ 27, 28

*Pacific Shores Dev., LLC v. At Home Corp (At Home Corp.),*
    392 F.3d 1064, 1070 (9th Cir 2004) ....................................................... 10, 15

*In re Parvin,* 59 B.R.
    268, (W.D. Wash 2016) ........................................................... 10, 14, 15, 20

*In re Perkins,*
    11 B.R. 160, 161, Bankr. D. VT 1980 ......................................................... 18

*Proudfoot Consulting Co. v. Gordon (In re Gordon),*
    465 B.R. 683, 692 (Bankr. N.D. Ga. 2012) ....................................... *passim*

*In re Rosson,*
    545 F.3d 764, 768 (9th Cir. 2008) .................................................................. 2

*Robinson v. Shell Oil Co.,*
    519 U.S. 337, 340 (1997) ............................................................................. 15

*Schlehuber v. Fremont Nat'l Bank (In re Schlehuber)*
    489 B.R. 570, 571 (8th Cir. B.A.P. 2013) ..................................... 1, 15, 19

*Trafficschool.com Inc. v. Edriver Inc.,*
    653 F. 3rd 820, 832 (9th Cir. 2011) ............................................................. 14

*U.S. v. Sutton,*
    786 F.2d 1305, 1308 (5th Cir. 1986) ........................................................... 18

*United States v. LKAV,*
    712 F.3d 436 .................................................................................... 1, 10, 15

*In re Wilderness Crossings, LLC,*
    440 B.R. 484 (Bankr. W.D. Mich. 2010) ................................................... 29

## **Primary Statutes**

11 U.S.C.§109(b) ...................................................................................... 19, 2
11 U.S.C. § 109(g), (h) ……………………………………………… 19
11 U.S.C. § 362 .............................................................. 4, 13, 17, 31, 38
11 U.S.C. § 707(b) ............................................................... 18, 19, 20
11 U.S.C. § 706(b) ...................................................................... *passim*
11 U.S.C. § 1129(b) .................................................................... *passim*

11 U.S.C. § 1141 .................................................................................17, 31, 31, 28

11 U.S.C. §§ 1325(b)(1) ..........................................................................18,37, 38

28 U.S.C. § 158(a)(1) ........................................................................................1

Cal. Civ. Proc. Code § 704.730 ........................................................................9

## <u>Other Authorities</u>

News Release, December 16, 2020, Bureau of Labor Statistics National
Census of Fatal Occupational Injuries in 2019
https://www.bls.gov/news.release/pdf/cfoi.pdf

# I.     JURISDICTION

Debtor Evander F. Kane ("Kane") filed a petition under Chapter 7 of the United Bankruptcy Code in the Northern District of California (the "Bankruptcy Court"), Case No. Case No. 21-50028 SLJ (the "Bankruptcy Case").  Zions Bancorporation NA, a creditor in the Bankruptcy Case, filed a motion under Bankruptcy Code Section 706(b)[1] requesting that the Bankruptcy Case be converted to a case under Chapter 11  (the "Conversion Motion")[2], to which several creditors (collectively the "Moving Parties"), including South River Capital, LLC ("Appellant"), filed a joinder.[3]  The Bankruptcy Court entered its Order Denying Motion to Convert (the "Order") on April 19, 2021.[4]  Appellant filed its Notice of Appeal with the Clerk of the Bankruptcy Court on May 3, 2021, within the 14-day period set forth in Bankruptcy Rule 8002(a)(1)[5] [6], and elected to have the appeal heard by the District Court under Rule 8005.[7]

The Appeal is timely.

This court has jurisdiction to hear the appeal from a final order issued by the Bankruptcy Court pursuant to 28 U.S.C. §158(a)(1).  An order on a motion to convert a case from one under Chapter 7 to one under Chapter 11 under Section 706(b) is a final order subject to appeal. See *e.g. Schlehuber v. Fremont Nat'l Bank (In re Schlehuber)* 489 B.R. 570, 571 (8th Cir. B.A.P. 2013); *See also Copper v. Copper (In re Copper)*, 314 B.R. 628, 630 (6th Cir. B.A.P. 2004), *aff'd*, 426 F.3d 810(6th Cir.

---

[1]   Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101- 1532.  All Rule references are to the Bankruptcy Rules.

[2]   Dkt #33, Motion.  (The Appendix .pdf has all docket numbers marked on a "bookmark"--the "ribbon" icon--on the left side of the .pdf document.)

[3]   Dkt #41, 49, 57, 63. Joinders

[4]   Dkt #101, Order.

[5]   Dkt #113, Notice of Appeal.

[6]   Dkt #115 Zions Bankcorporation, NA also filed a notice of appeal of the Order,

[7]   Dkt #114, Statement of Election.

2005) (citations omitted).  Specifically, "a bankruptcy order is considered to be final and thus appealable where it 1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed" *In re Rosson,* 545 F.3d 764, 768 (9th Cir. 2008).

Here, the issue is whether Kane may obtain a discharge of his debts under Chapter 7 while keeping all of his substantial post-petition salary, or whether the Court will convert the case to chapter 11 so that Kane may propose a Chapter 11 Plan that will pay creditors some part of those substantial earnings.  If the District Court does not hear this appeal, and Kane receives his discharge, any further motion to convert the case to one under Chapter 11 will be largely irrelevant. Thus, as a practical matter, the Order finally determines the issue of conversion for the purpose of appeal.

To delay converting Kane's case to Chapter 11 may also significantly reduce recovery by his creditors.  His contract with the San Jose Sharks ends in 2025, paying the highest annual salary of $7 million in the 2021 - 2022 season[8]. There is no way of knowing whether Kane, who will be 33 when the current contract expires, will be able get another NLH contract at the same salary, or at all. Thus, based on the information we have today, the longer it takes to begin a Chapter 11 plan, the less money there will be for Kane's creditors.

## II.    STATEMENT OF ISSUES ON APPEAL AND STANDARD OF REVIEW[9]

1.    Did the Bankruptcy Court apply the wrong legal standard when it denied the Conversion Motion?  In particular, when considering whether to convert Kane's' case under Section 706(b), did the Bankruptcy Court err by considering Kane's interests other than his ability to obtain a discharge

---

[8] Dkt. #33-1, Declaration of Michael Toal in Support of Zions' Motion to Convert ("Toal Decl.", p. 4.

[9] The text of the issues on appeal has been slightly changed for clarity.

of debt. Review of the Bankruptcy Court's interpretation of the Bankruptcy Code is *de novo. In re Federated Group,* 107 F.3d 730, 732 (9th Cir. 1997).  Once the law is determined, the review of the Bankruptcy Court's application of the rule to facts is a mixed question of fact and law and is also reviewed *de novo.   In re Bammer (Murray v. Bammer*), 131 F.3d 788, 792 (9th Cir. 1997)("mixed questions presumptively are reviewed by us *de novo* because they require consideration of legal concepts and the exercise of judgment about the values that animate legal principals.") *abrogated on other ground, Kawaahau v. Greiger*, 523 U.S. 57 (1998).

2.   Did the Bankruptcy Court impose an improper burden of proof on the parties moving for conversion to Chapter 11 when it required them to establish "with certainty" that converting Kane's case will provide a specific additional recovery for creditors?  As an issue of law, it is reviewed *de novo.*

3.   Did the Bankruptcy Court impose an improper burden of proof on the parties moving for conversion when it required them to "guarantee" confirmation of  a substantially consensual plan of reorganization that meets all requirements under 11 U.S.C. § 1129. *In re Baker,* 503 B.R. 751, 750 (Bankr. MD Fla 2013). As an issue of law, it is reviewed *de novo.*

4.   If the Bankruptcy Court had considered the motion with the correct legal standard, would it have erred in denying the Conversion Motion? This question is viewed on an abuse of discretion standard.

5.   Did the Bankruptcy Court err when it inferred from the Debtor's history of gambling and spending that a likelihood existed that the case would be immediately reconverted to one under chapter 7 under Bankruptcy Code Section 1112(b)(4)(A), when it simultaneously rejected the exact

allegations when considering whether to appoint a trustee in Chapter 11? This issue is reviewed on an abuse of discretion standard.

6.   Did the Bankruptcy Court err when it found that creditors who might obtain judgments of non-dischargeability might pursue Kane during the life of a Chapter 11 Plan, and thus that Kane would not benefit from converting the case to Chapter 11, when the automatic stay would prevent all such collection?  As a mixed issue of law and fact, the issue is reviewed *de novo.* 11 U.S.C. §§ 114(D)(5)(A), 362 (c)(2)(C).

## III.   STATEMENT OF THE CASE AND PROCEEDINGS BELOW

### A.   Kane's debts and his ability to pay them.

Evander Kane is a 29-year-old professional hockey player, currently playing for the San Jose Sharks (the "Sharks").[10]  Kane filed a chapter 7 bankruptcy petition on January 9, 2021 ("Petition Date").   No discharge has been entered.[11]

Kane's Bankruptcy Schedules list 34 creditors to whom he owes approximately $28.9 million.  The creditors include: lenders holding $7.75 million in claims secured by real property; service-providers (legal, accounting, agency, loan) holding $2.1 million in unsecured claims; and personal lenders holding a approximately 17.9 million in claims (the "Personal Lenders").  Of the Personal Lenders, six are listed as individuals owed between $150 and $750 thousand each. Several Personal Lenders have claimed different types of security interest in Kane's estate assets, though the primary interest—in his post-petition wages—is unenforceable in Bankruptcy.   11. U.S.C. §552 (See discussion below at V.A.3.a.)

His bankruptcy schedules list current assets of approximately $10.2 million, consisting primarily of three homes with stated values totaling approximately $8.2

---

[10] Docket ("Dkt") #65-1, Declaration of Evander Kane ("Kane Decl."), p. 1, lines 21 – 23.
[11] Dkt #160-2, Docket Report.

million and an expected tax refund of $1.8 million.[12]

Kane's primary asset is the salary he will earn over the next four years. He is in the third year of a seven-year contract with the Sharks.[13]  Under his Standard Players Contract (the "NHL Contract"), Kane stands to earn a post-Petition salary of $25 million between 2021 and 2025, with a $3 million base salary in the 2020-2021 League Year[14], and a $7 million base salary in the following year.  Additionally, Kane will receive two more signing bonuses of $2 million each in July of 2022 and 2024.[15]  The NHL Contract also provides certain guarantees of his salary if Kane is injured while working or terminated without cause.[16]

Therefore, according to the NHL Contract, Kane's gross income for the four years remaining on his contract will be $29 million, resulting in a $7.5 million average annual salary.[17] This amount is consistent with Kane's Statement of Financial Affairs, where he states under the penalty of perjury that his salary for prior years was in the range of $6 to $7 million.[18] At Kane's 341 Hearing, he testified that on a given year with a gross salary of $7 million, after taxes and other deductions, his estimated annual "take home" pay was between $2.3 to $2.6 million.[19]

Kane does not allege that he overstated the amount of his salary in his Statement of Financial Affairs or the amount of his net take-home pay at the 341

---

[12] Dkt #37, Amended Schedule A/B, pp. 1-9.

[13] Dkt #33-1, Toal Decl., pp. 4-22.

[14] Id.

[15] Dkt #33, Motion to Convert Case to Chapter 11 ("Motion"), p. 8; Dkt #33-1, Toal Decl., pp. 4 and 16.

[16] Dkt #33-1, Toal Decl., p. 6, para. 5(d) and p. 12, para. 13(d)(ii).

[17] Kane has asserted that as much as 20% of his base salary is tied to certain revenue targets (Dkt #65-1, Kane Decl., p. 4, ll. 16-21), though this does not appear in the NHL Contract, and Kane did not document this statement in his opposition to the Motion to Convert.  Even if this is true, that would reduce his salary to $23.2 million (80% of $29 million).

[18] Dkt. #29, Amended Statement of Financial Affairs, p. 2.

[19] Dkt #77-1, Declaration of Gerrick Warrington ("Warrington Decl."), pp. 6-7.

APPELLANT'S OPENING BRIEF
5

hearing.  Rather, in the opposition to the Conversion Motion, Kane emphasizes the net amount of the first paycheck he received for the 2020-2021 season in late January 2021 ($38,709)—in the middle of the COVID health emergency.[20]  Yet neither Kane, nor the Bankruptcy Court in the Order, explain how this single check relates to Kane's prior income or to any actual expectation of future income.[21]   Kane also does not explain why, once the COVID emergency has passed, his annual gross salary would not be in the $6 to $7 million range as in prior years described in his Amended Statement of Financial Affairs,[22] or that his net salary would not be in the previous range of $2.3 to $2.6 million.[23]

Kane's Amended Bankruptcy Schedule J reports annual "living" expenses totaling approximately $1.1 million ($93,214 per month). The most significant are:

| Expense | Amount |
|---|---|
| food and housekeeping supplies for a family of three | $96,000 |
| childcare for a six-month old daughter who is not stated as requiring special care[24] | $144,000 |
| Support for his "father, mother, grandmother, and uncles" | $180,000 |
| mortgage debt and home ownership expenses for his San Jose, California residence and two houses in Canada[25] | $528,000 |

Based on an average annual take-home salary of $2.45 million, even with these

[20] Dkt #65-1, Kane Decl., p. 6-7

[21] Dkt #65-1, Kane Decl., p. 5, lines 1-4.

[22] Dkt #29, Amended Statement of Financial Affairs, p. 2.

[23] Dkt. #77-1, Warrington Decl., p. 6-7.

[24] The Opposition to Motion to Convert simply references "medical related expenses" [Dkt #65, p. 15 of 25, l. 16.].

[25] Dkt #30, Amended Schedule J, pg. 10 - 11; Motion, p. 9.  Kane's Amended Schedule J and the Motion list these expenses on a monthly basis.

expenses of $1.1 million for a family of three, Kane could have annual disposable income of almost $1.35 million with which pay his creditors.  Over the four years remaining on Kane's contract, that would yield $5.4 million for a Chapter 11 plan.

Kane makes no effort to justify his extraordinary expenses.  Other than a claim in the Opposition to Motion to Convert that he "works hard to support his family, and the expenses are necessary to do so."[26]  There is no explanation why these expenses can be "reasonable" under any measure.  Rather, Kane argues that the amount that he might save if he changed his expenses "pales in comparison" to the amount of the claims.[27]  But Kane carefully avoids presenting any calculations.  If, for example, Kane's annual expenses of $1.1 million were cut in half to a $550,000 for a family of three, over four years it would bring an additional $2.2 million into the estate to pay Kane's debt, resulting in a possible estate of $7.6 million *in addition* to whatever funds the Chapter 7 would have recovered.

There are undoubtedly a variety of ways to describe Kane's ability to limit his expenses that will have slightly different results; Appellant has chosen the most straightforward.  What is not in doubt, however, is that Kane is contracted to earn millions over the next four years of his NHL Contract, which will provide at least the amount of the prior years' take-home pay.  Whether that results in $7 million, or $5 million or $4 million in disposable income, it is a substantial payment for his creditors.

### B.    Kane's Pre-Petition Activities

In the proceeding below, in both the motion to appoint a trustee on conversion, and in Kane's opposition, there are discussions regarding Kane's alleged dishonesty and bad motives, on the one hand, and efforts to negotiate his debts in good faith and work with the Chapter 7 trustee on the other. [28]  While they were relevant to the

---

[26] Dkt #65, Opposition to Motion to Convert, p. 15 of 25, lines 19-20.
[27] Dkt #65, Opposition to Motion to Convert, p. 15 of 25, line 21.

[28] Dkt #33, Motion, pp. 10-11; Dkt #65, Opposition to Motion to Convert, pp. 7-8.

motion to appoint a trustee, this appeal addresses only the Bankruptcy Court's decision to not convert the case to Chapter 11 under Section 706(b).  Allegations of Kane's motives or good faith are not relevant to this appeal and the allegations need not be recited.

### C.   The Conversion Motion and related proceedings.

1.   <u>The Conversion Motion</u>.  Zions Bancorporation filed the Conversion Motion on February 26, 2021, [29] that the remaining Moving Parties joined.[30]  The Conversion Motion also included a request that, on conversion, the court appoint a Chapter 11 trustee.[31]  The Court heard the Conversion Motion on March 30, 2021, and issued the Order denying it on April 19, 2021.[32]  Appellant South River Capital, LLC, appealed the Order to the extent it denied the motion to convert the case to one under Chapter 11.[33]  The part of the Order relating to appointing a Chapter 11 trustee is not the subject of this appeal. The principal moving party, Zions, also appealed the Order.[34]

2.   <u>Kane's proposed purchase of all non-exempt Chapter 7 assets for $255,000:</u> On March 4, 2021, the bankruptcy trustee, Fred Hjelmeset, filed his "Motion for Authority to Convey Estate's Equity in Real Estate and Resolve Dispute Concerning Bank Accounts" ("Trustee's Motion") to allow the Estate to sell Kane all of the Chapter 7 Estate's non-exempt assets—including the three houses-- for a payment of $255,000.[35]  The Trustee did not obtain independent appraisals of the three houses, instead relying on unfiled estimates of value from real estate brokers

---

[29] Dkt #33, Motion.

[30] Dkt #101, Order, p. 6, lines 26-28.

[31] Dkt #33, Motion, p. 5, line 7.

[32] Dkt #101, Order.

[33] Dkt #113, Notice of Appeal.

[34] Dkt #115.

[35] Dkt. #42, Motion for Authority to Convey Estate's Equity in Real Estate and Resolve Dispute Concerning Bank Accounts ("Trustee's Motion"), p.1.

and agents, and there is no evidence the Trustee investigated the validity of the recorded deeds of trust.[36]  The Trustee also accepted Kane's claim of a $600,000 homestead exemption, [37] although the property had been transferred from Kane's LLC to Kane and his wife one day before the bankruptcy was filed.[38]

Two creditors, Zions Bancorporation and Professional Bank, filed objections to the Trustee's Motion[39], and no further action has been taken by the trustee or the objecting creditors to set the contested matter for hearing or to resolve the dispute.[40] Thus, as of the date of this brief by Appellant it is unknown whether the Trustee's Motion will result in the recovery of funds for the estate.

3.   Kane's $600,000 Homestead.  Kane claimed a homestead exemption in his San Jose, California home in the amount of $600,000 pursuant to California Code of Civil Procedure section 704.730.[41]  Two creditors, Zions Bancorporation and Professional Bank, filed an objection to Kane's homestead exemption[42], and two more creditors, Centennial Bank and South River Capital, LLC, filed joinders.[43]  If disallowed in its entirely, $600,000 worth of nonexempt equity in Kane's home would be added to the bankruptcy estate for potential administration by the bankruptcy trustee. To date, the bankruptcy court has not issued an order either granting or disallowing Kane's homestead exemption.[44]

---

[36] Dkt #42-1, Declaration of Fred Hjelmeset in Support of Motion ("Trustee's Decl."), Exhibit A, p. 6 of 10.

[37] Dkt. #42-1, Trustee's Decl., p. 2.

[38] Dkt #74, Objection by Creditor Zions Bancorporation to Debtor's Homestead Exemption, p. 9, ll. 3-5; Dkt 74-1, Declaration of Gerrick Warrington in Support of Zions Bancorporation's Objection to Debtor's Homestead Exemption, p. 2 and p. 20, Exh. 4.

[39] Dkt #76 and Dkt #81, respectively.

[40] Dkt #160-2, Docket Report.

[41] Dkt #37, Amended Schedule C, p. 10.

[42] Dkt #74 and #79, Objections to Homestead Exemption by Zions Bancorporation and Professional Bank, respectively.

[43] Dkt #82 and #89, Joinders by Centennial Bank and South River Capital, respectively.

[44] Dkt #160-2, Docket report.

1   **IV.   SUMMARY OF ARGUMENT**

2           This appeal asks the District Court to find that the Bankruptcy Court acted

3   beyond the scope of its authority under the Bankruptcy Code when it refused to

4   convert Evander Kane's case to Chapter 11 under Section 706(b). The Bankruptcy

5   Court's decision allows Kane to keep the post-petition salary from his NHL Contract

6   rather than paying some portion of it to his creditors through a Chapter 11 plan. A

7   review of the Bankruptcy Court Order and the related law reveals that the Order is

8   clearly "results driven," both in considering factors far beyond the scope and purpose

9   of the Bankruptcy Code, and imposing a heightened burden of proof on the Moving

10  Parties. This Court will find that, if the appropriate burden of proof and standards are

11  applied, the Moving Parties met their burden and the case should be converted to

12  Chapter 11.

13          The Bankruptcy Court's authority is limited to acting within the scope of the

14  Bankruptcy Code. Its discretion is not a "roving commission to do equity," even

15  where a statute presents no detail for its implementation. *Pacific Shores Dev., LLC v.*

16  *At Home Corp (At Home Corp.),* 392 F.3d 1064, 1070 (9th Cir 2004). Rather, when

17  interpreting a statute, a court must examine "not only the specific provision at issue,

18  but also the structure of the statute as a whole, including its object and policy,"

19  *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir. 1999), and

20  its legislative history. *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013)

21          Bankruptcy Code Section 706(b) provides that: "on request of a party in

22  interest and after notice and hearing, the court may convert a case [under chapter 7]

23  to a case under chapter 11 of this title at any time." 11 U.S.C. §706(b). Courts

24  generally rely on the legislative history that states that a decision under the section

25  should be governed by what will "most inure to the benefit of all parties in interest."

26  *In re Parvin*, 549 B.R. 268, 271 (W.D. Wash 2016). The benefits of a bankruptcy

27  proceeding are often summarized as the right of creditors to be paid, and for a debtor

28  to obtain a "fresh start."  The benefits, however, are not just general concepts, but are

set forth in detail in specific chapters and sections Bankruptcy Code. (See discussion below at V.A.2.) Any decision made by a Bankruptcy Court must be limited to the benefits as stated in the Code.

Here, the Bankruptcy Court relies on the lack of guidance in Section 706(b) to justify the Court's considering possible benefits to Kane in staying in Chapter 7 that are far beyond the interests of debtors provided for in the Bankruptcy Code. Those interests include an assumption that Kane has a "statutory right" to obtain a discharge without contributing post-petition wages, when there is nothing in the Bankruptcy Code that guarantees such a discharge. Rather a discharge under Chapter 7 without paying future wages is only an opportunity, which is allowed only if the case is not dismissed for cause, the discharge is not denied as a result of an adversary proceeding, and the case is not converted under Section 706(b).  (See discussion below.)  The discharge is not a "right".

The Bankruptcy Court also allows Kane the "benefit" to retain non-exempt assets in a Chapter 7 when it considers that one result of not converting the case to Chapter 11 is to allow Kane to keep three multi-million dollar pieces of property and continue making payments while using post-petition wages. There is nothing in the Code, or in case-law, that recognizes any right of a Chapter 7 debtor to retain non-exempt assets.

The Bankruptcy Court finally places great weight on the impact of converting the case on Kane's professional hockey career, considering Kane's personal inclinations and the Court's perceived risks in the sport. But nothing in the Bankruptcy Code suggests that the particular needs of a career or a debtor's inclination to pursue it, should be considered when deciding whether to convert a case to Chapter 11 under section 706(b).

In its effort to rationalize its decision, the Bankruptcy Court, whether intentionally or not, imposed a heightened burden of proof on the Moving Parties, insisting that they "prove with certainty" that conversion to a Chapter 11 would

increase the creditors' recovery by a specific amount, and that they "guarantee" that a plan under Chapter 11 could be confirmed. (See discussion at V.B.) But the burden of proof in Bankruptcy Court is by the preponderance of the evidence, not "certainty" or "guarantee". *Grogan v. Garner, supra,* 498 U.S. at 287. The Court's requirement of certainty far exceeds this standard and alone constitutes a reason to reverse the case.

If the Bankruptcy Court had applied the correct legal standard and burden of proof, the Moving Parties met their burden under Section 706(b). Courts considering conversion to Chapter 11 under this Section regularly consider whether such conversion benefits the creditors by paying a greater recovery than in Chapter 7, and benefits debtors by providing a vehicle for negotiating with creditors and for paying possible non-discharged claims in a measured manner over a period of time. Courts also consider whether conversion would be futile where there is a risk of immediate conversion back to Chapter 7, or an inability to confirm a Chapter 11 plan. *See, e.g. In re Gordon, supra,* 465 B.R. at 691-691.

Here, as set forth in detail in the Statement of the Case, there is no question that Kane will have substantial funds from his NHL Contract with which to fund a Chapter 11 plan (though the Order complains the amount is "uncertain" and not "impactful"). The Bankruptcy Court instead focuses on perceived impediments to Kane proposing a confirmable plan.  All of the concerns, however, are directly contrary to admitted facts, or the Bankruptcy Code itself.

First, The Bankruptcy Court emphasizes the believed "uncertainty" of Kane's professional hockey career to support a Chapter 11 plan.[45] The concern appears to be based solely on the Court's perception of this sport, for there is no evidence to suggest that it is more difficult or dangerous than many other challenging careers,

---

[45] Dkt. #101 p. 15

such as logging, or truck-driving.[46] There is nothing to suggest that higher risk jobs must be excluded from reorganization under the Bankruptcy Code.

The Bankruptcy Court then claims that a Chapter 11 plan could be defeated by creditors holding non-dischargeable claims, even though no such claim has yet been found. It is pure speculation on the Court's part.[47] Even if there were creditors with non-dischargeable claims, however, they cannot interfere with the implementation of a Chapter 11 plan, as is argued by the Bankruptcy Court.  In a Chapter 11 for an individual, the automatic stay continues until the individual has completed making the payments under the plan.11 U.S.C.§ §1129(d)(5)(A), 362(c)(2) (See discussion below at V.C.3.c.)  Thus, an individual Chapter 11 debtor can be protected from actions of non-discharged creditors throughout the life of the plan.

The Court also expresses concern that creditors claiming security interests in Kane's wages could prevent the confirmation of plan, when the Court itself acknowledges that no such security interest would be recognized in the bankruptcy proceeding. [48] (See discussion at V. C.3.b.) Finally, the Court suggests that conversion might be futile if the case is immediately reconverted to Chapter 7, but then in the same Order, it states that it would *not* re-convert a Chapter 11 to Chapter 7, stating "were this case to be converted to Chapter 11, Debtor has shown he should at least have the opportunity to prosecute it himself." [49]

The Bankruptcy Court's Order does not set forth any valid bar to Kane or his creditors proposing a confirmable Chapter 11 plan on conversion of the case under Section 706(b).  And there is no question that Kane will earn enough money to fund a Chapter 11 plan.  Thus it is evident that conversion will benefit creditors.  It will also

---

[46] A report in 2020 by the United States Bureau of Labor Statistics listing the jobs with the greatest fatalities, for example, does not list professional hockey players or sports of any kind. *See, eg*.  https://www.bls.gov/news.release/pdf/cfoi.pdf

[47] Dct#101, Order p.17

[48] Dkt#101, Order p.15 fn.9

[49] Dkt #101, Order p.24

benefit Kane.  Kane will continue to be protected during the Chapter 11 plan by the automatic stay.  The plan will also allow him to negotiate and pay any non-discharged claims in a controlled manner at least during the life of the plan.

Because the Bankruptcy Court's Order was based on consideration of interests beyond the scope of the Bankruptcy Code and on the imposition of a heightened standard of proof on the Moving Parties, the Order must be reversed as a matter of law.

## V.   ARGUMENT

**A.   The bankruptcy court abused its discretion when it considered Kane's interests beyond the scope and purpose of the Bankruptcy Code to deny the Conversion Motion.**

1.   The legal standard that the Bankruptcy Court should apply when deciding a motion under Section 706(b) is limited to implementing the Bankruptcy <u>Code, including rules of statutory interpretation.</u>

Section 706(b) states simply "[o]n request of a party in interest and after notice and a hearing, the court may convert a case under [Chapter 7] to a case under chapter 11 of this title at any time." 11 U.S.C.  §706(b).  As the Code does not set forth specific requirements, cases generally begin the analysis with the position that the Court has broad discretion in making its decision.  *In re Parvin*, 549 B.R. at 271; *Schlehuber v. Fremont Nat'l Bank, supra,* 489 B.R. at p. 573.  A bankruptcy court abuses that discretion "if it applies the wrong legal standard, misapplies the correct legal standard, or if its factual findings are illogical, implausible, or without support in inferences that may be drawn from the facts in the record."  *Trafficschool.com Inc. v. Edriver Inc.,* 653 F. 3rd 820, 832 (9th Cir. 2011).  The appellate court reviews the lower court's choice and application of the legal standard to the question as a matter of law *de novo*. *Condon v. Brady (In re Condon),* 358 B.R. 317. 320 (6th Cir. BAP 2007).

///

///

1     The cases generally agree that, because there are "no specific grounds for

2  conversion [under Section 706(b)], a court should consider anything relevant that

3  would further the goals of the bankruptcy code." *Schlehuber v. Fremont Nat'l Bank*

4  *supra,* 489 B.R. at p. 573, citing *Proudfoot Consulting Co. v. Gordon (In re Gordon),*

5  465 B.R. 683, 692 (Bankr. N.D. Ga. 2012).  This standard is consistent with the

6  general rules of statutory interpretation and limitations of judicial discretion. When

7  reading a statute, the first step is to determine whether the language has a plain and

8  unambiguous meaning with regard to the particular dispute.  *Robinson v. Shell Oil*

9  *Co.*, 519 U.S. 337, 340 (1997).  In doing so, the court will examine "not only the

10  specific provision at issue, but also the structure of the statute as a whole, including

11  its object and policy." *Children's Hosp. & Health Ctr. v. Belshe*, *supra,* 188 F.3d at

12  1096.  The court "will also look to similar provisions within the statute as a whole

13  and the language of related or similar statutes to aid in interpretation." *United States*

14  *v. LKAV*, 712 F.3d at 440  If the statutory language is ambiguous, then the court may

15  consult legislative history. *Id.*

16     Cases interpreting Section 706(b) regularly rely on a phrase in the legislative

17  history that the court should base its decision on "what will most inure to the benefit

18  of all parties in interest." *In re Parvin, supra,* 549 B.R. at 721, citing H.R.Rep. No.

19  595, 95th Cong., 1st Sess. At 380 (1977). But neither Section 706(b)'s lack of

20  guidelines, nor this single comment in the legislative history mean that the Court can

21  go beyond the scope of the Bankruptcy Code by relying on personal perception of

22  fairness when making its decision.  The Bankruptcy Court's equitable powers "must

23  and can only be exercised within the confines of the Bankruptcy Code." *Norwest*

24  *Bank Worthington v Ahlers* 485 U.S.197, 206 (1988). The 9th Circuit confirmed this

25  limitation in *Pacific Shores Dev., LLC v. At Home Corp (At Home Corp.), supra,* 392

26  F.3d at 1070, stating: "statutory silence alone does not invest a bankruptcy court with

27  equitable powers. Those powers are limited and do not amount to a roving

28  commission to do equity." *Id. internal citations omitted.*

2.     When a Bankruptcy Court considers a debtor's "fresh start" when deciding a motion to convert under Section 706(b), the court must limit its inquiry to the Bankruptcy Code itself.

The Bankruptcy Code has the twin goals of "maximization of realization on creditors' claims" and to grant an "honest and unfortunate debtor" a "fresh start" free of his debts. *See* e.g. *Holsman v. Weinschneider,* 322 F. 3rd 468, 475 (7th Cir 2003); *Grogan v. Garner,* 498 U.S. 279, 287 (1991). It is also generally recognized that these goals are inherently at odds with each other. "While creditors seek to maximize their recovery, debtors understandably seek to discharge their debts. . .". *In re Decker,* 535 B.R. 828, 838 (Bankr. D. Alaska 2015) *aff'd* 548 B.R. 813 (D. Alaska 2015). The goals are not independent of the Bankruptcy Code, but summarize its central elements; their implementation is neatly organized in the Bankruptcy Code's 15 chapters. Chapters 1 and 3 address general provisions and administration; Chapter 5 addresses "Creditors, the Debtor, and the Estate"; Chapter 7 addresses liquidation; Chapter 9 addresses municipalities; Chapters 11, 12, and 13 provide for reorganizations; and Chapter 15 addresses cross-border cases.

The Bankruptcy Code provides for a creditor's goal of maximizing recovery on its claim primarily in Chapter 5 regarding "Creditors and Claims" (§§501 to 511); exceptions to discharge (§542); and various sections treating priorities of claims to be paid (§507), and protection of security interests (e.g. §§506, 361, 352(d), 3654(d)). The Code also requires fair treatment of creditors. For example in confirming a Chapter 11 plan, the Code requires that a proposed plan that is not accepted by all classes must "not discriminate unfairly, and [be] fair and equitable with respect to each class of claims" that does not accept it. 11 U.S.C. § 1129(b)(1). The Code also assures fair treatment of creditors in a Chapter 11 by providing for a creditors committee to represent and maximize the interests of *all* unsecured creditors. 11 U.S.C. §1103. *In re Nat'l R.V. Holdings, Inc*., 390 B.R. 690, 700 (Bankr. C.D. Cal.

2008) [describing the creditor's committee's fiduciary duty to protect the interest of all unsecured creditors.]

The Bankruptcy Code creates a debtor's "fresh start" primarily by: protecting the debtor and assets from collection with the automatic stay (§ 362);  exempting specific assets from the bankruptcy estate (§522); granting a discharge from debts (§§ 727, 1141, 1228 and 1328); imposing a permanent injunction against all action to collect a discharged debt (§524); prohibiting discriminatory treatment stemming from bankruptcy (§525);  and in reorganizations, allowing a debtor to continue its business, and retain assets free and clear of liens pursuant to a confirmed plan meeting certain goals (§§1227, 1337 and 1141).

The core of the "fresh start" is the discharge, which the Supreme Court has vigorously protected.  *See, e.g. In re Kawaauhau v. Geiger,* 523 U.S 57, 62 (1998) [reiterating the rule to narrowly view exceptions to discharge].  The legislature, however, in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"),[50] has recently placed greater burdens on debtors seeking to obtain one. Among other things, if a creditor objects to an individual's proposed plan of reorganization under Chapter 13 (if the debtor is above median income) or Chapter 11, BAPCPA now requires the debtor to contribute five years of post-petition "disposable  income" to pay creditors. 11 U.S.C. §§1325(b)(1)(B), 1129(a)(15)(B).[51] BAPCPA also created a presumption that a debtor with primarily consumer debts is abusing the bankruptcy system if his "disposable income" exceeds certain minimums. 11 U.S.C.§707(b).

---

[50] Pub. L. No. 109-8, 119 Stat. 23 (April 20, 2005).

[51] "Disposable income" is calculated differently in Chapter 13 and Chapter 11.  In both cases it is the amount of the debtor's income, less expenditures that are "reasonably necessary" to support the debtor and their dependents and to operate a business if there is one.  But in Chapter 13, under Section 1325(b) (3), "reasonably necessary" can be limited to amounts described in the consumer debtor "means test" in Section 707(b)(2). In Chapter 11, in Section 1129(a)(15)(B), "reasonably necessary" is defined with reference only to Section 1325(b)(2), without reference to the more restrictive limitations on consumer debtors.  *In re Roedemeier, 374* B.R. 264, 271-72 (Bankr. D Kan 2007).

APPELLANT'S OPENING BRIEF

17

The Court in *In re Decker, supra 535 B.R. at 836*, provided a detailed analysis of why the rules of BAPCPA should be considered when deciding a motion to convert an individual's case under Section 706(b).  "An individual debtor's post-petition earnings are now property of the chapter 11 bankruptcy estate", and upon objection of any allowed unsecured creditor, a debtor seeking plan confirmation "must provide his or her projected disposable income over a five year period." *Id. Decker* noted that Bankruptcy Code section 1129(a)(15) now "help[s] ensure that debtors who can pay creditors do pay them.'" *In re Decker, supra,* 535 B.R. at 836, n. 29.

Although Section 706(b) is silent regarding a debtor contributing disposable post-petition income to the estate to pay creditors, the extensive detail in the Code sections referenced above describing what are "reasonably necessary" expenses for a debtor seeking a discharge, and the expectation that a debtor may be required to contribute five years of post-petition wages, are both part of the "structure of the statute as a whole."  *Children's Hosp. & Health Ctr. v. Belshe, supra,* 188 F.3d at 1096.  These factors must be considered by a Bankruptcy Court when determining "what will inure to the benefit of all parties in interest" in deciding whether to convert a case under Section 706(b).

Finally, the Court cannot use its discretion to expand a debtor's rights under the guise of "fresh start."  *U.S. v. Sutton,* 786 F.2d 1305, 1308 (5th Cir. 1986) [Court reversed allowance of family-support payments that were not otherwise permitted by Bankruptcy Code, holding the bankruptcy court is not "authorize[d] to  create substantive rights that are otherwise unavailable under applicable law or constitute a roving commission to do equity."]  *See also, In re Perkins,* 11 B.R. 160, 161, Bankr. D. VT 1980) [Court refuses to use its discretion to find debtor with excess spending needed discharge from student loans in order to obtain "fresh start"].

///

///

3.   The Bankruptcy Court abused its discretion when it interpreted Kane's "fresh start" to include rights and interests beyond the scope of the Bankruptcy Code.

(a)   The Bankruptcy Code does not grant a debtor a "statutory right" to obtain discharge without contributing post-petition wages.

The Order states: "The motion does not challenge [Kane's] statutory eligibility to be a debtor under Chapter 7. This being so, [Kane] has a statutory right to discharge and fresh start and to receive his future income free from financial encumbrances" *sic.*[52] There are only three situations in which an individual cannot be a debtor under Chapter 7 as a matter "of statute": 1) where a consumer-debtor filing Chapter 7 is presumed to be abusing the Bankruptcy Code if they maintain disposable income in excess of strictly described limits (§707(b)(2)); 2) under certain circumstances where the individual has been a debtor within the prior 180 days (§109(g)); and, 3) where the debtor has not obtained pre-petition credit counseling (§109(h)).

Thus, according to the Order, unless an individual debtor fails one of these technical requirements, he has a "right" to a discharge without contributing any post-petition wages, and can thereby defeat any motion to convert the case under Section 706(b). When the Order is read in connection with the generally-accepted consideration of what " will most inure to the benefit of all parties in interest," it clearly raises the interests of the Debtor above the interests of his creditors.

Contrary to the Bankruptcy Court's ruling, there is nothing in the statute or the Bankruptcy Code that so limits a creditor's motion to convert a case under Section 706(b), and several courts have expressly rejected the argument that a debtor's wishes can defeat a motion to convert. The Eighth Circuit Bankruptcy Appellate Panel, in *Schlehuber v. Fremont, supra,* 489 B.R. 570, after noting that "the Debtor's position amounts to an argument that his interests (or desires) should be paramount to

---

[52] Dkt #101, Order, p. 19, lines 7-10.

those of his creditors", held: "[c]ontrary to the Debtor's apparent belief, nothing in §706(b) states that an individual debtor's interest should control whether his case is converted to chapter 11." *Id.* at 575-576; *See also, In re Parvin, supra,* 549 B.R. at 272, [appellate court rejects the debtor's allegation of "burden" of paying post-petition wages as sufficient to defeat the creditor's 706(b) conversion motion].

An individual filing for relief under Chapter 7 is seeking a discharge without paying future wages to creditors. It is an *opportunity* at best, not a right, and succeeds only if there is no denial of discharge (§727), no dismissal for cause (§707), no technical barrier to the Chapter 7 (see discussion above), and no conversion in the interests of all parties (§706(b)). For the Bankruptcy Court to have assumed that Kane has a "right" to obtain a discharge under Chapter 7 was beyond the scope of the Bankruptcy Code and was an abuse of discretion.

(b)    The Bankruptcy Code does not grant a debtor a right to retain non-exempt assets.

The Order asserts that "the bargain a Chapter 7 debtor strikes is to turn over all of his non-exempt assets to a Chapter 7 trustee for administration and payment of creditors' claims. . . ."[53]  But that is not what is happening here. Under Kane's Chapter 7 case, he walks away owning three large properties: a residence in San Jose, valued at $3,275,000; a residence referenced as the "Isabel Property" in Vancouver, British Columbia, valued at $2.9 million (CAN); and a residence referenced as the 35th Ave. Property, co-owned with his mother, also in Vancouver, British Columbia valued at $3.3 Million (CAN).[54] As noted by the Order, the Chapter 7 allows Kane to "keep and continue making payments on several pieces of real property" while using post-petition wages."[55]

---

[53] Dkt #101, Order, p. 18, lines 17-18.

[54] Dkt #42, Trustee's Motion, pp. 3-4, Exhibit A (Notice and Opportunity for Hearing on Trustee's motion).

[55] Dkt #101. Order, p. 16,  line 6-7.

The Order acknowledges that "the Debtor may have non-exempt equity in his properties."[56] And while the Trustee has proposed that Kane may purchase his equity for a total of $255,000,[57] that valuation has been challenged.[58]  From the Trustee's perspective, Kane's proposed payment of $255,000 for his current equity gets the Chapter 7 estate immediate assets without the cost and uncertainty of litigation.[59] Since the Chapter 7 estate does not include Kane's wages, the fact that he is making mortgage payments of $37,990.63 a month for the three properties going forward is not part of the Trustee's assessment of the transaction.

The Court asserts that, in contrast to the Chapter 7 case, under a Chapter 11 plan Kane would not be able to keep the properties without contributing "new value." The Court references the rule that, to confirm a plan to which a class of creditors objects, a debtor can only keep non-exempt assets if all creditors are paid in full or if the debtor "purchases" the assets with money that is not part of the estate-- the "new value."[60]  § 1129(b)(2)(B). The Court doubts (without any evidence) that Kane could obtain a source of new value, in the form of a loan, for example.  It concludes that no plan could be confirmed that allows Kane to keep three multi-million dollar pieces of real property.  *Id.*

But the Court assumes that an entire class of creditors will object to the hypothetical plan--the condition that triggers the rule.  The Court also does not consider that Kane has no right under the Bankruptcy Code to keep the nonexempt properties.  Kane could also propose a plan that sells them (or allows the over-encumbered properties to be foreclosed) and uses the liberated mortgage payments to pay creditors.  For the Bankruptcy Court to have considered the benefit to Kane of

---

[56] Dkt #101, Order p. 16, fn10.

[57] Dkt #42, Trustee's Motion.

[58] Dkt #76 and Dkt #81, Objections by Zions Bancorporation and Professional Bank, respectively.

[59] Dkt #41, Trustee's motion for authority to convey estate's interest in real property.

[60] Dkt #101, Order, p. 16, lines 5-21.

1    retaining non-exempt property as part of the Court's decision to not convert the case

2    was beyond the scope of the Bankruptcy Code and was an abuse of discretion.

(c)    The Bankruptcy Code does not grant a debtor the right to have
3
peculiarities of his sports career considered.
4

5        A central focus throughout the Order is the Court's consideration of Kane's

6    personal needs and inclinations regarding his professional hockey career.  The Order

7    describes its consideration of the "debtor's right to make some central choices in life,

8    such as his professional hockey career."[61] It goes on to describe the particularities of

9    a professional sports career, referencing Kane's "personal choice in view of the high

10   level of commitment and serious risk of playing."[62]  The Order, however, does not

11   cite anything in the Bankruptcy Code to suggest that Kane's career goals are relevant

12   to the decision to convert a case under 706(b).  There are other careers that also

13   require commitment and risk— working in the armed forces, or on an oil derrick, or

14   as a ballet dancer, for example— which do not get special consideration in a

15   bankruptcy.

16       In fact, only a handful of careers are specifically addressed in the Bankruptcy

17   Code: family farmer or family fisherman (§§ 109(b)(18)-(20), 109(f) and Chapter

18   12); and a stockbroker or commodities trader (§§109(b)(6), 109(b)), Chapter 7,

19   Subchapters III and IV[63].  If Congress had intended that other individual career

20   choices should be considered in a bankruptcy proceeding, it would have provided for

21   it.

22       The Bankruptcy Court may be inferring that Kane might choose to abandon his

23   challenging career if the case is converted; but Kane has made no such threat, stating

24   that he should "be afforded the opportunity to prove his capability of running a

25

26   ──────────────

27   [61] Dkt #101, Order page 19, lines11-12.

     [62] Dkt #101, Order, p. 19, lines12-14.
28
     [63] Provisions regarding stockbrokers and commodities brokers run throughout the Code.

transparent and efficient Chapter 11 process".[64]  The Order also describes that a
Chapter 11 trustee would substantially interfere with the debtors ability to perform.[65]
What is not explained is why Kane cannot pursue his career in a Chapter 11 as a
debtor-in-possession if the case is converted and no trustee is appointed. There is
certainly no "right" for individuals playing professional sports to be free from using
their salary to pay their creditors when other debtors are not.

While the Bankruptcy Court does not state that the Order is based entirely on
any one of these unsupported "rights" of Kane as a Chapter 7 debtor, each of them is
woven closely through the text, making it impossible to determine what the judge
would have decided if he had not considered issues beyond the scope of the
Bankruptcy Code.  As set forth below, consideration of the record within the scope of
the Bankruptcy Code will result in conversion of the case.

    B.   **The Bankruptcy Court imposed a heightened burden of proof on the Moving Parties by requiring they prove "with certainty" a specific amount of recovery under a proposed Chapter 11, and to "guarantee" that a consensual plan could be confirmed.**

    1.   The burden of proof in bankruptcy court proceedings is by a preponderance of the evidence, not a standard of "certainty" or clear and convincing evidence.

In its decision of *Grogan v. Garner, supra,* 498 U.S . at 287 (1991), the United
States Supreme Court explained that even though states regularly found that a
standard of clear and convincing evidence was necessary to establish fraud, the court
was "unpersuaded by the argument that the clear and convincing standard is required
to effectuate the fresh start policy of the bankruptcy code."  *Id.*  While the court was
considering whether a creditor must meet the "clear and convincing" standard to
except a claim from discharge under Section 523(a) (which excludes claims arising
from "actual fraud"), the analysis applies.

---

[64] Dkt #65, Opposition to Motion to Convert,. p. 20, lines 22-23.

[65] Dkt #101, Order, p. 19, lines 11 - 26 and p. 20, lines 1-2.

Here, the conversion of the case to one under Chapter 11 does not have the severe result of denying the debtor a discharge that was considered in *Gogan v. Garner,* but only of delaying that discharge to allow Kane to pay a greater amount to his creditors. Nothing in the Order or the Bankruptcy Code supports a claim that the burden of proof on the Moving Parties in the Conversion Motion was anything but the preponderance of the evidence.

    2.    The Bankruptcy Court improperly required that the creditors "prove with certainty" that conversion would increase recovery by a specific amount, and to "guarantee" the confirmation of a plan.

The Order acknowledges that under section 706(b) there are no specific grounds for conversion,[66] then lists four possible factors to be considered: 1) the debtor's ability to repay debt; 2) the absence of immediate grounds for reconversion; 3) the likelihood of confirmation of a Chapter 11 plan; and 4) whether the parties and interest would benefit from conversion, citing *Decker v. U.S. Trustee,* 548 B.R. 813, 817 (D. Alaska 2015).[67] Neither *Decker,* nor any case counsel could locate, requires a that party moving to convert a case to Chapter 11 must prove that conversion would result in paying a specific amount to creditors, or increase payment by a specific percentage. Nor did any case require the movant to "guarantee" the confirmation of a Chapter 11 plan.

In deciding whether creditors would benefit from conversion of Kane's case, however, the Bankruptcy Court imposed just such burdens on the Moving Parties. In describing the potential funds to be brought into the bankruptcy estate on conversion, the Bankruptcy Court states that "it is *uncertain just how much of the Debtor's salary will be available* to fund a plan"[68] and that it "may not be *as impactful as [movant*

---

[66] Dkt #101, p. 10, line 1.

[67] Dkt #101, Order, p. 10, lines 3-8.

[68] Dkt #101, Order, p. 13 line 8.

*asserts*".[69]   The Order states that Kane's salary is "objectively significant" and that "obviously, converting the case will mean additional funds for Creditors"[70] but concludes that because "there is serious uncertainty regarding how much income to expect from Debtor", the Court would not convert the case.[71]   Nowhere does the Order cite authority that a specific amount or percentage be recovered on conversion under Section 706(b) or that it must be proven with "certainty". (The admitted facts *do* show that the amount that will be brought into the estate if the case is converted is significant by any measure. As described above, Kane's admitted testimony reveals an expected disposable income of over $5 million over the next four years even if the precise amount cannot be identified. (See Section III(a).)

The Court also requires the Moving Parties to "guarantee" confirmation of a consensual plan on conversion to Chapter 11. When discussing the question of whether a plan could be confirmed, the Order focuses on the conflict between Kane and his creditors and comments "creditors suggest these matters are subject to easy resolution but cannot guarantee this is so."[72]   The Court does not acknowledge that Kane could propose a plan that could be confirmed even without all of the creditors agreeing. 11 U.S.C. § 1129(b).

As the Bankruptcy Court did not acknowledge that the burden of proof is by a preponderance of the evidence, but instead repeated its insistence of proof with "certainty" and a "guarantee" of confirmation, the Court must find that the Bankruptcy Court imposed an improper burden of proof on the Moving Parties and find that it abused his discretion.

///

///

---

[69] Dkt #101, Order, p. 13, lines 11-12 (emphasis added).

[70] Dkt #101, Order, p. 13, lines 11-13.

[71] Dkt #101, Order, p. 18, lines 10-11.

[72] Dkt #101, Order, p. 16 lines 3 to 4.

C.  **Under the correct legal standard and burden of proof, the Moving Parties met their burden under Section 706(b) and the case should be converted.**

Each of the factors that the Order states it considered in making its decision go essentially to the question of futility: (1) whether the debtor will pay a greater amount to his creditors than in a Chapter 7, (2) whether there will be an immediate re-conversion back to chapter 7, (3) the likelihood of there being a confirmed plan; and (4) whether the parties would benefit.[73] The record shows that the Moving Parties established each factor by a preponderance of the evidence, and that if the Bankruptcy Court had applied the correct legal standard, it would have granted the motion to convert the case.

1.  The Bankruptcy Court concedes, and the evidence establishes that Kane's post-petition salary will add a substantial amount to the bankruptcy estate.

Kane filed an amended statement of financial affairs that states that his gross income for the calendar year of 2018 was $6 million and for the two years from 2019 through 2020 was $7 million per year.[74] According to the NHL Contract, Kane's gross wages, including the anticipated bonuses, will be $29 million over the next four years, resulting in a $7.5 million gross annual salary.[75]  Kane does not provide any calculation of his actual expected pay for the remaining term of the NHL Contract, but acknowledged in his 341 hearing that, after taxes and all fees were deducted from his pay, his average take-home pay in prior years was "roughly anywhere between 2.3 and 2.6 million."[76] Except for Kane's reference to a single paycheck in January 2021 in the middle of the Covid health emergency, which is not stated as

---

[73] Dkt #101, Order, p.10, lines 3-9.

[74] Dkt #29, Amended Statement of Financial Affairs,, p. 2.

[75] Dkt #33-1, Toal Decl., Exhibit 1, NHL Contract, p. 4 and p. 16.

[76] Dkt # 77-1, Warrington Declaration, p. 6, line 16 to p. 7, line 5.

representative of his subsequent paychecks, Kane does not deny that he will continue to earn his contract salary in an amount consistent with prior years. He attempts to diminish the impact of his significant salary by relying on speculated uncertainty arising from the Covid health emergency. But as of March 2021 he states that only 3 games had been postponed.[77]

The Bankruptcy Court recognized that Kane's gross salary for the 2020-2021 season was $3 million[78] and acknowledged that "obviously converting the case will mean additional funds for creditors."[79]  The Order does not reference the provision in the NHL Contract providing for a $7 million salary in the 2020-2021 season.[80]  Nor does the Order acknowledge that additional funds would be available in a converted Chapter 11 case and to Kane's creditors should Kane reduce the extraordinary monthly expenses as described in the Amended Schedule J filed with the Court.[81] Just by cutting Kane's stated $1 million annual living expenses in half would provide $2 million for an estate over four years.  These admitted facts clearly establish that Kane is more likely than not to be able to fund a Chapter 11 plan.

2.    By holding that the Bankruptcy Court would not appoint a trustee if it converted the case to Chapter 11, it confirmed that the case would not be immediately re-converted to Chapter 7.

The question of whether a case would be immediately re-converted to a Chapter 7 is considered in order to avoid a futile order. (*See In re Re Gordon, supra,* 465 B.R. at p. 692 ["[I]f cause exists to re-convert [the case] from Chapter 11 under § 1112(b), conversion from Chapter 7 under section 706(b) would be a futile and wasted act."]  The only argument put forward by either the opposition or in the Order

---

[77] Dkt #65-1 Kane's declaration p. 5

[78] Dkt # 101, Order, p. 4, lines 8-9.

[79] Dkt #101, Order, p. 13, line 12-13.

[80] Dkt #33-1, NHL Contract, p. 4.

[81] See discussion above at §III, A., pp. 5-6.

that the case would be immediately re-converted to one under Chapter 11 assumed

the court would accept the allegations that Kane's pre-petition mis-management and

gambling would be a basis for appointing a trustee[82].  But the Bankruptcy Court

found that Kane's pre-petition spending and other actions would *not* justify the

appointment of a trustee, and that "were this case to be converted to Chapter 11,

Debtor has shown he should at least have the opportunity to prosecute it himself."[83]

3.   The Bankruptcy Court's finding that the Debtor cannot
propose a confirmable Chapter 11 plan is not supported by
the record and is largely contrary to the Bankruptcy Code.

The consideration by a court of the possibility that a the debtor can confirm a

plan upon conversion to a Chapter 11 is, also, essentially a question of avoiding a

futile act of converting a case to Chapter 11 only to have to convert it back.  This

consideration, however, does not mean that a party moving under Section 706(b)

must present or prove a confirmable plan in order to have the case converted. When

considering this issue the Court in *In Baker*, *supra,* 503 B.R. at 759 noted:

> In considering conversion to Chapter 11, a Court may be
> inclined to consider the prospects for reorganization in much
> the same way that it considers the feasibility at the time of
> confirmation hearing. Instead of pre-determining the issue of
> feasibility at a conversion hearing, however, the C*ourt should
> defer its findings on feasibility and the other requirements of
> §1129 until a confirmation hearing is properly noticed and
> scheduled.*

*[quotation omitted, emphasis added]; See also In Re Gordon,* s*upra*, 465

B.R. 6 at 693. [court declines to find that the potential objection of a creditor

made a potential plan of re-organization not feasible].

///

///

---

[82] Dkt #65, Opposition, p. 13, lines8-15; Dkt #101, Order, p. 14lines 1-7.

[83] Dkt #101, Order, p. 24, lines 20-23.

APPELLANT'S OPENING BRIEF
28

In a similar context, a court considering whether a debtor could stay in a Chapter 11 case in the face of a motion to convert to a Chapter 7, the Court in *In re Wilderness Crossings, LLC*, 440 B.R. 484, 489 (Bankr. W.D. Mich. 2010) stated that: "in many respects, the hearing causes the court to consider the prospects for reorganization in much the same way that it considers feasibility at a confirmation hearing. . . ." But, having found that staying in Chapter 11 was in the best interests of the creditors and the estate, the court noted: "[n]othing in this opinion, however, should be construed as finding that the Debtors' plans are feasible. The court will address that issue at confirmation." *Id.* Thus, the Bankruptcy Court's insistence that the Moving Parties prove that a Chapter 11 plan will be confirmed was premature.

          (a)     The Court's finding that creditors would defeat confirmation of a plan in expectation of obtaining a non-discharge claim is inconsistent with the record and creditors joinder in the motion to convert.

The Order states that because certain creditors intend to seek non-dischargeability of their claims, they "will have an interest in defeating confirmation [of a plan] if the plan does not provide for their payment in full, and perhaps even if it does, as they would be submitting to payment over an extended period."[84] This statement ignores that four of the largest creditors moved to convert, which was hardly likely if they did not intend to support a Chapter 11 plan. Furthermore, no claim has been established to be non-dischargeable to date. Even if a creditor had a non-dischargeable claim, it would still benefit from a Chapter 11 plan that brought some of Kane's substantial wages into the estate for a regular orderly distribution. The non-discharged creditor would otherwise need to seek a judgment and then wage-garnishment for enforcement[85]. Thus, the Court's consideration that there *might* be non-dischargeable claims, which *might* be sufficient in number and amount to

---

[84] Dkt #101, Order, p.14, lines14-19.

[85] Among other things, a wage garnishment would be limited to a percentage of Kane's disposable earnings (C.C.P. §706.050) for all creditors.

defeat a plan, and *might* vote to defeat it is pure speculation; it is certainly not a sufficient basis to conclude that Kane is incapable of presenting a confirmable plan, or that converting the case is futile.

        (b)    The nature of Kane's career does not mean that he or the <u>creditors cannot propose a feasible plan.</u>

The Order makes much of the risk of the Debtor's high-paying hockey career: "one is left to wonder how many more years debtor can reasonably be expected to play in such a physically demanding environment"[86] and concludes "I am not convinced the plan so dependent on the Debtor continuing to play hockey for several years without interruption has a reasonable probability of success."[87] This raises the question whether the Bankruptcy Court will deny confirmation to any individual working in a physically demanding profession as too speculative, or whether the consideration is limited to sports professionals in particular.[88]

Even if Kane threatened to quit his job if the case is converted, that is not a basis to deny conversion under Section 706(b). The court in *Decker* rejected the same argument where the debtors, a husband and wife, argued that Mr. Decker could "simply retire and walk away from his job. They would then live off their considerable retirement income". The court held that the debtor's statement that he did not want to pay his creditors did not make conversion to Chapter 11 under Section 706(b) futile. *In Re Decker, supra* 535 B.R. at 840.

---

[86] Dkt #101, Order, p. 15, lines 13-14.

[87] Dkt #101, Order, p. 17, lines 27-28.

[88] Indeed, another NHL hockey player appears to have successfully confirmed a Chapter 11 Plan. John Joseph Louis Johnson III, then playing for the Columbus Blue Jackets, confirmed a Chapter 11 plan, funded by his post-petition NHL salary paid into a creditors trust. In re Johnson, No. 14-57104, 2016 Bankr. LEXIS 4598 (Bankr. S.D. Ohio Nov. 10, 2016). As shown in the docket, the plan was completed. This Court may take judicial notice of proceedings in other courts that are relevant to the current issue. *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990). Fed.R.Evid.201(d).

1
2

     (c)     The possibility of as-yet undetermined non-dischargeable or secured debt does not mean Kane or the creditors cannot propose a feasible plan.

3

4       The Order asserts that if there are some non-discharged claims, "nothing in the

5  Code will prevent [those creditors] from continuing to collect from Debtor outside

6  the plan."[89]  This statement is directly contrary to the Bankruptcy Code.  Section

7  1141(d)(5)(A) provides that where a debtor is an individual, a "confirmation of the

8  Chapter 11 plan does not discharge any debt provided for in the plan until the court

9  grants a discharge on completion of all payments under the plan."  And section

10  362(c)(2) provides that the automatic stay continues in an individual case until the

11  time a discharge is granted or denied, or the case is closed or dismissed.  This means

12  that as long as an individual debtor in a Chapter 11 is making payments under the

13  plan, the stay continues as to claims that are provided for.  Nor is there any

14  requirement that a plan must provide full payment to non-discharged unsecured

15  creditors. "Instead the debtor need only formulate a plan which pays the

16  nondischargeable debts pro rata with other unsecured creditors during the life of a

17  plan" *Copland v. Fink (In re Copeland)* 742 F 811, 814 (8th Cir. 2014)."

18       The Order referenced the unpublished opinion of *In re Hamilton*, 803 F.Appx

19  123 (9th Cir. 2020)[90] to support the position that a plan could not enjoin non-

20  discharged creditors from attempting to collect their debt during the plan term.  The

21  *Hamilton* opinion addresses whether an injunction can be included in a plan, not

22  whether the automatic stay prevents the described collection.  The point is made in

23  the dissent of the opinion. *Supra* at p. 126-128.  Thus the Code clearly provides that

24  the automatic stay will continue to protect the debtor and estate until the Chapter 11

25  Plan is complete. 11 U.S.C. § 1141(5)(A).

26  ///

27

28

---

[89] Dkt 3101, Order, p. 17, lines 12-13.

[90] Dkt #101, Order, p. 17, lines 2-3.

Finally, there is no question that Kane's post-petition salary is free from any pre-petition security interest and can be used to fund a plan.  The Order sets up a false argument that the existence of possible secured claims against Kane's wages "imperils confirmations of a plan".[91]  But the Order then acknowledged that no such security interest is recognized in the 9th Circuit, stating: "The Bankruptcy Appellate Panel has held they are not.  *See In re Skagit Pac. Corp.*, 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004) ("Revenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest."); *see* § 552(b)."[92] *See also, Johnson v. RFF Family P'ship LP (In re Johnson)* 554 B.R. 448 (S.D. Ohio 2016) [providing a detailed analysis of why there was no security interest in post-petition salary earned under an NHL contract.]

The issue is not whether there might be challenges to a plan, or that a party might make an unsupportable claim on Kane's salary, but whether a confirmable plan may be proposed, and thus that conversion to Chapter 11 is not a futile act. *See In Re Baker, supra,* 503 B.R.  at 759. With millions of dollars of unencumbered salary to fund a plan, there is no question that a confirmable plan can be proposed.

> (d)   The record establishes a strong likelihood that, whether presented by the debtor of the creditors, a confirmable plan may be proposed.

There's no requirement for a motion under 706(b) to be accompanied by a proposed plan of re-organization, or a confirmation brief, or a Chapter 7 liquidation comparison. *In re Baker, supra,* 503 B.R. at 759.  In fact, here Kane has not provided sufficient information with which a creditor could build such a plan. At this time, Kane has not objected to a variety of claims he states are disputed, nor formally challenged creditors' claims of security[93]. Nor has he suggested in what way he might

---

[91] Dkt #101, Order, p. 15, lines 24-25.

[92] Dkt #101, Order, p.15 fn 9.

[93] Dkt #160-2, Docket Report.

adjust his monthly expenses to contribute additional funds to the bankruptcy estate, or even acknowledged they are excessive.  With such uncertainty, any proposed outline of a possible Chapter 11 plan is highly speculative. It *is* clear, however, that it is more probable than not that millions of dollars will be brought into the estate with conversion to Chapter 11, and that no absolute bar to conversion has been presented.

Both the Bankruptcy Court and Kane's opposition make a great deal of the possible costs of a Chapter 11 estate.[94]  But this is a hollow argument. Much of the administrative cost in a Chapter 11 will be incurred by Chapter 7 trustee in any case. This includes objections to claims, as well as the normal expenses of accounting, tax preparation, and claims administration.  While a Chapter 11 case would also involve costs for plan development, negotiation and confirmation, possibly a creditor's committee and claims adjudication, no one seriously argues that even these costs would exceed the additional millions brought into the estate.  (See discussion above at §§III.A. and V.C.1.)

## VI.    CONCLUSION

When the interests of Kane and the creditors are considered within the scope and purpose of the Bankruptcy Code, the record shows that both the Kane and creditors will be served by a conversion to Chapter 11.  There is no real dispute that the creditors will be served as a result of the conversion as it is admitted that millions of dollars will be added to the estate, and not seriously stated that administrative costs will absorb that entire amount. Also, a Chapter 11 can provide a creditors committee to protect the interest of all unsecured creditors, particularly the six individual Personal Lenders who may not otherwise be represented.[95]  11 U.S.C. §1103. *In re Nat'l R.V. Holdings, Inc*., *supra,* 390 B.R. at 700.

///

///

---

[94] Dkt #101, Order, p. 13, lines 18-20; Dkt #65, Opposition, p. 20, lines 24-26.

[95] Dkt # 18 Amended D & E/F.

Kane will also be served. To the extent any claims are determined to be non-dischargeable, Kane will be given breathing space to make payments to all of his creditors through his Chapter 11 plan, while the automatic stay remains in place to prevent any collection efforts. (See above at §V.C.3.c.)  Further, the Chapter 11 plan will give Kane an opportunity to address any non-dischargeable claims in a measured and controlled manner during the life of the plan rather than facing multiple lawsuits in state court and aggressive collection action.

For the reasons set forth above Appellant requests the court to:  reverse that portion of the Order denying the Conversion Motion and direct the Bankruptcy Court to enter an order converting the case to one under Chapter 11, or, in the alternative, to direct the Bankruptcy Court to reconsider Conversion Motion with clear directions to apply the correct legal standard and burden of proof and decide the motion within the scope of the Bankruptcy Code and the evidence in the record.

Dated: July 6, 2021                           BINDER & MALTER, LLP


                                         By: /s/ Wendy Watrous Smith
                                              Wendy Watrous Smith

                                         Attorneys for South River Capital LLC

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1. This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B) because it contains 11,747 words,  (inclusive of items allowed to be excluded from length under Fed.R.Bankr.P. 8015(g)).

2. This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because it has been prepared in a proportionally-spaced typeface using  Microsoft Word, and using 14 point Times New Roman font.

Date:  July 6, 2021

/s/ *Wendy Watrous Smith*
Wendy Watrous Smith

# PRIMARY STATUTE TEXTS

**United States Bankruptcy Code – Title 11  – Bankruptcy Section 706 – Conversion of Chapter 7:**

(a)   The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable.

(b)  On request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time.

(c)  The court may not convert a case under this chapter to a case under chapter 12 or 13 of this title unless the debtor requests or consents to such conversion.

(d)  Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.

**Section 1129(a)(15) – Confirmation of Chapter 11 Plan for Individuals:**

In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—

(A)  the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B  ) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

///

///

///

**Section 1325(b)(2) - Definition of "disposable income" for Individuals:**

(b)…

(2)  For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than payments made under Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID–19), child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—

(A)(i)  for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii)  for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B)  if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

**Section 1141(d)(5) – Effect of Confirmation of Chapter 11 Plan for Individuals:**

(5)  In a case in which the debtor is an individual—

(A ) unless after notice and a hearing the court orders otherwise for cause, confirmation of the plan does not discharge any debt provided for in the plan until the court grants a discharge on completion of all payments under the plan;

**Section 362(c)(2) – Termination of Automatic Stay**

(c) Except as provided in subsections (d), (e), (f), and (h) of this section—

(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate;

(2) the stay of any other act under subsection (a) of this section continues until the earliest of—

(A) the time the case is closed;

(B) the time the case is dismissed; or

(C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied;